# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FILED

AUG 2 3 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**MARK D. JASPERSON**
**9824 Bay Island Drive**
**Tampa, FL  33615**

      **Plaintiff,**

        **v.**

**FEDERAL BUREAU OF PRISONS,**
**320 First Street, N.W.,**
**Washington D.C.  20534,**

      **and**

**HARLEY G. LAPPIN,**
**Director, Federal Bureau of Prisons,**
**320 First Street, N.W.,**
**Washington D.C.  20534,**
**sued in his official capacity,**

      **Defendants.**

```
CASE NUMBER  1:06CV01488

JUDGE: Henry H. Kennedy

DECK TYPE: TRO/Preliminary Injunction

DATE STAMP: 08/23/2006
```

## MOTION FOR A TEMPORARY RESTRAINING ORDER

    COMES NOW plaintiff Mark D. Jasperson, by and through counsel, and

respectfully moves this Court to issue a Temporary Restraining Order pursuant to Rule

65(b) of the Federal Rules of Civil Procedure against defendant Lappin, and the Bureau

of Prison employees.  As grounds therefore, plaintiff relies on and incorporates by

reference his Memorandum in Support of a Temporary Restraining Order and plaintiff's

Declaration of August 22, 2006.

Wherefore, plaintiff requests that a Temporary Restraining Order be entered requiring defendant Lappin and the Bureau of Prisons to reconsider plaintiff's CCC placement in good faith in accordance with the standards employed by the Bureau of Prisons prior to December 2002 and without consideration of 28 CFR § 520.20 and 520.21, and that within ten calendar days of this Order or before plaintiff is required to report to the Bureau of Prisons, whichever is earlier, an affidavit be filed with this Court demonstrating compliance. Plaintiff requests that defendant be enjoined from requiring plaintiff to surrender to a BOP facility until this action is completed. Plaintiff requests that bond be waived or set in a <u>de minimus</u> amount.

Respectfully submitted,

Brian W. Shaughnessy, DCN 89946
913 M Street, NW
Suite 101
Washington, DC 20001
(202) 842-1700

Attorney for the Plaintiff
Mark D. Jasperson

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**MARK D. JASPERSON**
**9824 Bay Island Drive**
**Tampa, FL 33615**

      **Plaintiff,**

        **v.**

**FEDERAL BUREAU OF PRISONS,**
**320 First Street, N.W.,**
**Washington D.C. 20534,**

**and**                            **Case No. _____**

**HARLEY G. LAPPIN,**
**Director, Federal Bureau of Prisons,**
**320 First Street, N.W.,**
**Washington D.C. 20534,**
**sued in his official capacity,**

      **Defendants.**

## MEMORANDUM IN SUPPORT OF MOTION
## FOR A TEMPORARY RESTRAINING ORDER

Plaintiff Mark D. Jasperson, by and through counsel, in support of his motion for a

preliminary injunction, pursuant to Federal Rule of Civil Procedure 65, requiring the defendants

to consider his placement in a halfway house on or about August 31, 2006, without reliance on

the Bureau of Prisons' new rule regarding such transfers, relies on this Memorandum in Support

of Motion for Temporary Restraining Order and plaintiff's Declaration and exhibits thereto, filed

herewith, and the entire record herein.

## PROCEDURAL HISTORY AND FACTUAL BACKGROUND

On May 5, 2006, Plaintiff was sentenced to a four month term of incarceration as a result of a guilty plea to one count of tax evasion in Case No. 9:04-cr-285-T-26MAP. District Court Judge Lazzara "**strongly recommend [ed]** confinement at a local Community Sanctions Center so that the defendant can continue to operate his business" [emphasis in original].

This sentence was imposed based upon the sentencing judge's assessment of the severity of the offense, the characteristics of the defendant and the potential for harm to hundreds of innocent parties if the defendant were rendered incapable of operating a struggling business that provided jobs, insurance and benefits to hundreds of families. It appears that the judge also considered the strong likelihood that the business would not continue if the defendant were not allowed to participate in a work-release program that allowed him to continue to operate the business.

The sentencing judge recognized that this outcome was not possible in a Federal Prison Camp (where work-release is not an option) and that the sentence could only be effectuated by placement in a local Community Sanctions Center. It was clear to the sentencing judge that it was necessary to place the Plaintiff in a Community Sanctions Center "to allow him to operate his business" and save hundreds of jobs and benefits for hundreds of families. According to a BOP regulation put into place on February 14, 2005, Plaintiff was not eligible for direct placement in a Community Sanctions Center despite the strong judicial recommendation. On August 11, 2006, the U.S. Marshal's Service sent a Designation Letter to Plaintiff requiring him to report to the United States Penitentiary, Satellite Camp in Atlanta, Georgia on Thursday, August 31, 2006 before noon Eastern Standard Time despite the strong judicial recommendation that he be assigned to a local Community Corrections Center (CCC),

commonly known as a halfway house.

The Plaintiff who wished to be designated to serve his four month sentence at a CCC, has petitioned for injunctive relief arguing that this BOP policy and regulation is invalid. Plaintiff has filed suit contending that the regulation misconstrues the discretion granted to the BOP by § 3621(b). Plaintiff respectfully requests that the District Court find the BOP policy invalid and require the BOP to consider in good faith whether to directly designate Plaintiff to a Community Sanctions Center to serve his four month sentence.

## LEGAL STANDARD

It is well established that to obtain a temporary restraining order or preliminary injunction, the plaintiff must demonstrate (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the requested relief is not granted, (3) that an order or injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the temporary restraining order or injunction. CityFed Financial Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995); Sea Containers Ltd. v. Stena AB, 890 F.2d 1205, 1208 (D.C. Cir. 1989); and Mova Pharmaceutical Corp. v. Shalala, 329 U.S.App.D.C. 341, 140 F.3d 1060 (D.C.Cir.1998). The trial court is to balance those factors, not necessarily giving equal weight to each. Cuomo v. United States Nuclear Regulatory Comm'n, 772 F.2d 972, 974 (D.C. Cir. 1985). "The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated. Although the grant of interim relief is an extraordinary remedy, it should be granted in the limited circumstances which clearly demand it." See United States v. Jefferson Co., 720 F.2d 1511, 1519 (11th Cir. 1983).

3

## ARGUMENT

### I.    THE BALANCE OF HARDSHIPS FAVORS THE PLAINTIFF.

"Although the decision to grant or deny interlocutory injunctive relief depends upon a flexible interplay among all the factors considered, it is clear that the two more important factors are those of probable irreparable injury to the plaintiff without a decree and of likely harm to the defendant with a decree." Maryland Undercoating Co., Inc. v. Payne, 603 F.2d 477, 481 n.9 (4th Cir. 1979). In this case, the balance of hardship favors the plaintiff.

#### A.    The Plaintiff Will Suffer Irreparable Harm if a Five Month Halfway House is Denied.

At the most basic level, if the BOP is permitted to arbitrarily deny plaintiff the benefit of his transfer to a halfway house for the last five months of his term, plaintiff will lose benefits and liberties that had been granted him by the BOP. For the last five months of his term, plaintiff will be deprived of the opportunity to adjust to his reentry into society, plaintiff will be unable to assist his family, the business may deteriorate and he will suffer an absolute, irrevocable loss of those liberties, all of which is not susceptible to remedy by money damages.

##### 1.    The Refusal of Placement Will Violate the Plaintiff's Civil Rights.

As discussed in more detail below, the BOP's adoption and enforcement of the new rule violates the plaintiff's rights under the Due Process, Equal Protection, and *Ex Post Facto* clauses of the United States Constitution. The United States Supreme Court has held on more than one occasion that a violation of constitutional rights constitutes irreparable injury warranting interim injunctive relief. See Elrod v. Burns, 437 U.S. 347 (1976); Doran v. Salem Inn, Inc., 422 U.S. 922 (1975). In Elrod, the Court held that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionable constitutes irreparable injury." Elrod, 427 U.S. 347, 373. In approving injunctive relief, the Court stated that since constitutional injury was "either

4

threatened or in fact being impaired at the time relief was sought," a preliminary injunction was appropriately granted to protect the plaintiffs from irreparable injury. Id. at 364; see also Giovani Carandola, Ltd. v. Bason, 303 F.3d 507, 520-21 (4th Cir. 2002) (upholding preliminary injunction in First Amendment challenge to statute and regulation prohibiting certain lewd entertainment).

Although this case does not raise First Amendment questions-which were the issue in Elrod and Doran-the rights at issue in this case are also rights "which must be carefully guarded against infringement." See Elrod, 427 U.S. at 373. Thus, it seems clear that a finding of irreparable injury should be made here, as well. See Gresham v. Windrush Partners, Ltd., 730 F.2d 1417 (11th Cir. 1984)(housing discrimination constitutes irreparable injury); Clemons v. Board of Education of Hillsboro, Ohio, 228 F.2d 853 (6th Cir. 1956)(segregation constitutes irreparable injury); Pathways Psychosocial v. Town of Leonardtown, MD, 223 F. Supp. 2d 699 (D. MD 2002)(discrimination on the basis of disability is presumed to be irreparable injury); Able v. United States of America, 847 F. Supp. 1038 (E.D.N.Y) 1994)(discrimination on the basis of sexual orientation constitutes irreparable injury).

The rationale behind treating constitutional injuries as irreparable is that no other form of redress appears available if the preliminary injunction is denied, and, later on the merits, a constitutional violation is found to have occurred. This is particularly true in cases, as here, in which the constitutional violation might likely become permanent due to the extended time necessary to complete the litigation.

### 2. The Defendants Will Suffer No Harm From the Granting of Injunctive Relief.

The rule at issue in this case was adopted in response to a legal opinion issued by the Department of Justice's Office of Legal Counsel (attached to Colton Declaration as Exhibit B).

There is no suggestion in that opinion or elsewhere of any rationale for the rule other than a perceived inconsistency in the application of the law. Indeed, representatives of BOP have noted that enforcement of the rule is coming at great effort and cost for the agency because it requires the administrative expense of redesignation and the practical expense of transfer and housing at higher security institutions. Rather than imposing a burden, the entry of a preliminary injunction is likely to save the defendants time and money. See Hurt v. BOP, in which Judge Fitzpatrick found that the entry of a preliminary injunction would be a benefit to the BOP financially and administratively. USDC M.D. GA, Memorandum Order, September 19, 2003, attached hereto. Given this framework the Court should find that the balance of the hardships weighs in favor of the plaintiff.

### B.      The Public Interest Weighs in Favor of the Plaintiff.

In considering the balance of the hardships, "the court should consider wherein lies the public interest, sometimes described as preserving the status quo ante litem until the merits of a serious controversy can be fully considered by a trial court." Maryland Undercoating Co., 603 F.2d at 481. In addition to preserving the plaintiff's designation to the halfway house, the Court may consider a variety of other "public interests" which pertain in this case, including safeguarding constitutional rights, maintaining the integrity of the rulemaking process, fostering respect for the criminal justice system, preserving the family unit, and protecting small businesses. See 3 Moore's Federal Practice § 65.22[3] (Matthew Bender 3d ed.). All these interests weigh in favor of the plaintiff.

This precipitous sea change[1] in the administration of the BOP was not based on considerations of a broad consideration of the impact of the new rule, but merely on the

---

[1] The nature of the change was best described by District Judge Brady, who explained that under the pre-existing procedure, a reasonable imprisonment was envisioned for Ms. Ferguson by the U.S. Attorney, the court and Ms.

6

Department of Justice legal opinion changing the BOP's longstanding, well-established and apparently effective utilization of community correctional centers.

The governmental interest is set forth in the LEGAL RESOURCE GUIDE TO THE FEDERAL BUREAU OF PRISONS, 2003, which, in pertinent part states:

> The Federal Bureau of Prisons (BOP) was established in 1930 to provide more progressive and humane care for Federal inmates, to professionalize the prison service, and to ensure consistent and centralized administration of the 11 Federal prisons in operation at that time. . . . The mission of the BOP is to protect society by confining offenders in the controlled environments of prisons and community-based facilities that are safe, humane, cost-efficient, and appropriately secure, and that provide work and other self-improvement opportunities to assist offenders in becoming law-abiding citizens.

The arbitrary abandonment of a fairly effective early transfer program will adversely impact consistent administration of the prisons, will remove many from community based facilities that are humane and cost-efficient and will limit opportunities for offenders to become adjusted to reentry into the community as law-abiding citizens. Thus, this new rule not only deprives Mr. Jasperson of due process, but also it is contrary to the long-established purposes of the BOP as is further demonstrated below.

The efficacy of the halfway house process is well recognized. The BOP has found it useful and it has received broad-based support in the legal-correctional community. See e.g., Blueprint for Cost-effective Pretrial Detention, Sentencing and Corrections Systems, ABA, Criminal Justice Section August 2002, Halfway Houses Less of an Option in White-Collar Crime, Los Angeles Times, May 25, 2003, Community Update, BOP, June 28, 2002, Electronic

---

Ferguson's attorney. "And that is precisely what happened. Until, that is, some Washington D.C. bureaucrat determined that the entire legal world had been acting under the same shared "unlawful" fantasy for decades and acted to bring us all back into step with his vision of the law." Ferguson v. Ashcroft, 248 F.Supp. 3d. 547, 561 (D.C.M.D.La. 2003). That "vision of the law" is what has deprived Mr. Colton of his transfer to the halfway house.

7

Monitoring vs. Halfway Houses: A Study of Federal Offenders by Jody Klein-Saffran, Project Greenlight, Vera Institute of Justice.

Prior to the December 2002 reversal of policy, the BOP had been expanding and improving the use of the halfway house program. See Survey on the Effectiveness of the Comprehensive Sanctions Centers, by James L. Beck and Jody Klein-Saffran, Ph.D., American Probation and Parole Association Perspectives, (Summer 1997), 20(3), pp. 34-7. Indeed, to accomplish one of its primary goals:

> to help ensure sufficient capacity to imprison violent offenders to the fullest extent of the law, DOJ will increase the percentage of its population in other-than-BOP facilities. These include halfway houses, contract facilities, and home confinement. Use of secure and community-based alternatives to traditional confinement helps BOP address the prison overcrowding problem by placing nonviolent Federal prisoners in other-than-BOP facilities. "Performance Goal 5.2.3," FY 99 Annual Accountability Report, U.S. Department of Justice.

Raag Singahl, Esquire, Co-Chairman of the Corrections Committee of the National Association of Defense Lawyers, in reacting to the BOP halfway house policy change said, "Removing halfway houses as a sentencing option runs counter to recent trends in state judicial systems, which are increasingly turning to community corrections as a way to save money and ease prison crowding." While Mr. Singhal was not speaking for the BOP, his admonition is the type of issue that should have been raised before the BOP so radically altered its policy. A measure of difficulties this restriction will have is the fact that the Lexington facility where Mr. Colton will be retained is now occupied beyond its capacity and were it a private facility it would probably be shut down. This new policy will exacerbate the overcrowding.

Perhaps more significant is the impact that this BOP edict will have on halfway house treatment for drug program attendees, a group the OLC opinion seeks to except from the policy change. Briefly put, the OLC opinion claims, relying on Section 3624 (c), that non-drug

8

offenders cannot be transferred to a halfway house unless they are within 10% of the end of their sentences, but that drug program attendees may continue to be transferred under Section 3621 (e), even though Section 3624 (c) applies equally to all inmates, including the latter class. While we do not argue that drug program attendees should be stopped being transferred to a halfway house prior to 10% of the end of their sentence, when the BOP recognizes the legal implication of the OLC opinion and ends that transfer policy as in violation of Section 3624 (c) there will be significant dislocation in the BOP drug program under Section 3621 (e); costs to the taxpayer and prison overcrowding will mount enormously.

We point this phenomenon out to the Court to demonstrate the effect of the BOP's failure to consider matters that would come up in the course of APA rulemaking and to show that the public interest will be served by granting injunctive relief until the defendants consider the consequences of their rash act.

## II.     THE PLAINTIFF HAS DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS.

### A.     **Exhaustion Of Administrative Remedies**

The Court may first inquire whether Plaintiff has exhausted his administrative remedies, if any are available. Because plaintiff has not been incarcerated, but merely designated improperly, there are no administrative remedies that seem to apply at this point. Nonetheless, plaintiff has pursued agency resolution of this matter by requesting relief from the BOP Regional and National Offices and the Deputy Attorney General's Office. None would resolve this matter for plaintiff.

In another context, i.e., post-incarceration, it is well settled that federal prisoners must exhaust or attempt to exhaust their federal administrative remedies prior to filing a habeas corpus petition under 28 U.S.C. § 2241. *Martinez v. Roberts*, 804 F.2d 570, 571 (9th Cir. 1986); see also

*Fendler v. United States Parole Comm'n*, 774 F.2d 975, 979 (9th Cir. 1985). [**5] The

exhaustion requirement is not, however, jurisdictional in § 2241 cases. *Rivera v. Ashcroft*, 394

F.3d 1129, 1139 (9th Cir. 2005).  Rather, "exhaustion of administrative remedies is not required

where the remedies are inadequate, inefficacious, or futile, where pursuit of them would

irreparably injure the plaintiff, or where the administrative proceedings themselves are void."

*United Farm Workers of America v. Ariz. Agr. Emp. Rel. Bd.*, 669 F.2d 1249, 1253 (9th Cir.

1982) (citation omitted); see also *Fraley v. United States Bureau of Prisons*, 1 F.3d 924, 925 (9th

Cir. 1993) (exhaustion waived where request for administrative remedy initially denied by

Community Corrections Office based upon official BOP policy and further appeal would almost

certainly have been denied based upon the same policy). Here any exhaustion of administrative

remedies should be excused. First, by the time Plaintiff exhausts every available administrative

remedy, he would be done with serving his entire sentence.

Exhaustion is not required when the plaintiff may suffer irreparable injury if he is

compelled to pursue his administrative remedies. See *S.E.C. v. G.C. George Sec., Inc.*, 637 F.2d

685, 688 n. 4 (9th Cir.1981) (exceptions to the general rule requiring exhaustion cover situations

such as where administrative remedies are inadequate or not efficacious, pursuit of

administrative remedies would be a futile gesture, irreparable injury will result, or the

administrative proceedings would be void.").  Here, plaintiff will probably have served his entire

sentence and his company will probably have gone into dissolution or bankruptcy if he must go

through the BOP administrative process.

According to the BOP policy, Plaintiff is not entitled to release to a CCC until the last

six months or the last ten percent of his sentence, whichever is lesser. The policy further

provides that direct designation to a CCC is not permissible under any circumstances, unless the

10

Plaintiff was convicted in the Third or Eighth Circuits, where he would receive different treatment. Even if he were to make a futile attempt to exhaust any administrative remedies the BOP would have sufficient response time to take up the vast majority of Plaintiff's four month sentence. As provided in 28 C.F.R. §§ 542, upon receipt of a formal written Administrative Remedy Request, the Warden or Community Corrections Manager has 20 days to respond. The inmate then has 20 more dates to appeal to the Regional Director, who has 30 days to respond. If still dissatisfied, the inmate may appeal to General Counsel within an additional 30 days, to which the General Counsel has 40 days to respond. See 28 C.F.R. §§ 542.

In addition, it appears clear that Plaintiff's claim will be rejected based upon an official BOP policy. The BOP policy at issue is the result of a directive from the Department of Justice which the BOP would unlikely change even if they had the power to do so. Moreover, the government has pointed out in a case out of the Eighth Circuit that the "use of the grievance procedure to contest the validity of the BOP's policy would be futile." *Elwood v. Jeter*, 386 F.3d 842, 843, n. 1 (8th Cir. 2004); see also *Drew v. Menifee*, 2005 WL 525449 (S.D.N.Y. 2005); *Pinto v. Menifee*, 2004 WL 3019760 (S.D.N.Y. Dec. 29, 2004); *Terry v. Menifee*, 2004 WL 2434978 (S.D.N.Y. 2004). Accordingly, to the extent there is an administrative process, requiring plaintiff to pursue it would be futile and cause him irreparable harm; any such requirement should be excused.

B.    **The Substance of the New Rule is Contrary to Law.**

1.    **Administrative Procedure of The Bureau Of Prisons**

The Bureau of Prisons (BOP) passed a regulation that limits the portion of an inmate's sentence that can be served in a Community Corrections Center (CCC), commonly known as a halfway house.

11

28 C.F.R. § 570.20 states:

(a) This subpart provides the Bureau of Prisons' (Bureau) categorical exercise of discretion for

designating inmates to community confinement. The Bureau designates inmates to community

confinement only as part of pre-release custody and programming which will afford the prisoner

a reasonable opportunity to adjust to and prepare for re-entry into the community.

(b) As discussed in this subpart, the term "community confinement" includes Community

Corrections Centers (CCC) (also known as "halfway houses") and home confinement.

28 C.F.R. § 570.21 states:

(a) The Bureau will designate inmates to community confinement **only** as part of pre-release

custody and programming, during the last ten percent of the prison sentence being served, not to

exceed six months. (emphasis supplied)

(b) We may exceed these time-frames only when specific Bureau programs allow greater periods

of community confinement, as provided by separate statutory authority (for example, residential

substance abuse treatment program (18 U.S.C. § 3621(e)(2)(A)), or shock incarceration program

(18 U.S.C. § 4046(c)).

## 2.    Background Of BOP Designations to CCCs and Recent Policy Changes

From the institution of CCC programs in 1965 until December 2002, the BOP followed

judicial recommendations and allowed an inmate to be directly designated to a CCC for up to six

months, regardless of the total length of the inmate's sentence. On December 13, 2002, the Office

of Legal Counsel for the Department of Justice issued a memorandum stating that this practice

was inconsistent with 18 U.S.C. § 3624(c) which, in its opinion, limited an inmate's placement

in a CCC to the lesser of six months or ten percent of the inmate's sentence. Section 3624(c)

states:

12

> The Bureau of Prisons shall, to the extent practicable, assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed six months, of the last 10 per centum of the term to be served under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for the prisoner's re-entry into the community. The authority provided by this subsection may be used to place a prisoner in home confinement. The United States Probation System shall, to the extent practicable, offer assistance to a prisoner during such pre-release custody.

The BOP adopted the Office of Legal Counsel's interpretation of this statute, but the courts later rejected that interpretation and invalidated the December 2002 policy in *Elwood v. Jeter,* 386 F.3d 842 (8th Cir. 2004). In February 2005, in response to *Elwood* and a similar decision from the First Circuit, *Goldings v. Winn*, 383 F.3d 17 (1st Cir. 2004), the BOP created new regulations governing the placement of inmates in CCCs. These regulations state that the BOP was engaging in a "categorical exercise of discretion" and choosing to "designate inmates to [CCC] confinement only . . . during the last ten percent of the prison sentence being served, not to exceed six months." 28 C.F.R. § 570.20-21. The BOP contended that this exercise of discretion is permissible under 18 U.S.C. § 3621(b) which states:

> The Bureau shall designate the place of the prisoner's imprisonment. The Bureau may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau, whether maintained by the Federal Government or otherwise and whether within or without the judicial district in which the person was convicted, that the Bureau determines to be appropriate and suitable, considering--
> (1) the resources of the facility contemplated;
> (2) the nature and circumstances of the offense;
> (3) the history and characteristics of the prisoner;
> (4) any statement by the court that imposed the sentence--
>     (A) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or
>     (B) recommending a type of penal or correctional facility as appropriate; and
> (5) any pertinent policy statement issued by the Sentencing Commission pursuant to section 994(a) (2) of title 28.
> In designating the place of imprisonment or making transfers under this subsection, there shall be no favoritism given to prisoners of high social or economic status. The Bureau may at any time, having regard for the same matters, direct the transfer of a prisoner from one penal or correctional facility to another. The Bureau shall make available appropriate

13

substance abuse treatment for each prisoner the Bureau determines has a treatable condition of substance addiction or abuse."

These regulations are similarly invalid and, so far as counsel has been able to determine, have been uniformly declared by all courts considering that issue.

### 3.    Deference To An Agency's Statutory Interpretation

Although an agency's interpretation of a statute that it is entrusted to administer is generally entitled to deference, *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844, 81 L. Ed. 2d 694, 104 S. Ct. 2778 (1984), if the intent of Congress is clear, there is no need to defer to the agency's interpretation. *Haug*, 317 F.3d at 835, 838-39. Plaintiff contends that the BOP's interpretation of the statute is contrary to the statute's unambiguous language. As such, the agency is not entitled to deference to the BOP's interpretation.

### 4.    Distinction of This Case from Lopez v. Davis

There is no question that § 3621(b) provides the BOP with broad discretion to choose the location of an inmate's imprisonment. The question is whether that discretion can be exercised on a categorical basis. The BOP seems to believe that its exercise of discretion is consistent with the Supreme Court's opinion in *Lopez v. Davis*, 531 U.S. 230, 121 S. Ct. 714, 148 L. Ed. 2d 635 (2001).

In *Lopez*, the Supreme Court addressed the BOP's categorical exercise of discretion under 18 U.S.C. § 3621(e)(2)(B), which stated that an inmate convicted of a non-violent offense could have his or her period of incarceration reduced after successfully completing a drug treatment program. The BOP had issued a regulation excluding inmates from early release under this provision if they were convicted of non-violent crimes involving firearms. 28 C.F.R. § 550.58(a)(1)(vi)(B). The Supreme Court upheld the regulation stating that nothing in the statute

14

at issue prohibited "categorical exclusions." *Lopez*, 531 U.S. at 243.

Plaintiff contends that Lopez is distinguishable from this case. As the Lopez Court noted, "constraints . . . requiring the BOP to make individualized determinations based only on postconviction conduct-are nowhere to be found in § 3621(e)(2)(B)." Id. at 241-42. In fact, the subsection at issue in Lopez offers no specific criteria to be considered-other than the overarching criterion that only nonviolent offenders are eligible for early release. Accordingly, the BOP can make categorical decisions within that class of offenders without violating that subsection.

Subsection 3621(b) is different from § 3621(e)(2)(B) in that the former lays out criteria that must be considered by the BOP in making placement the history and characteristics of the prisoner, and any statement by the court that imposed the sentence-cannot be fully considered without evaluating inmates on a case-by-case basis. Accordingly, *Lopez*, which dealt with a subsection void of any individual criteria, is not controlling.

The Second, Third, and Eight Circuits are the only Court of Appeals to have ruled on the validity of the BOP's February 2005 regulation. See *Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235 (3d. Cir. 2005); *Fults v. Sanders*, 442 F.3d 1088 (8th Cir. 2006); and *Levine v. Apker*, 2d Cir. Docket No. 05-2590, decided July 10, 2006. In holding that the regulation was invalid, the *Woodall* court said:

> The regulations do not allow the BOP to consider the nature and circumstances of an inmate's offense, his or her history and pertinent characteristics, or most importantly, any statement by the sentencing court concerning a placement recommendation and the purposes for the sentence. And yet, according to the text and history of § 3621, these factors must be taken into account. The regulations are invalid because the BOP may not categorically remove its ability to consider the explicit factors set forth by Congress in § 3621(b) for making placement and transfer determinations. *Woodall*, 432 F.3d at 244.

15

In *Woodall, Fults*, and *Levine v. Apker,* 2d Cir. Docket No. 05-2590, decided July 10, 2006, the BOP offered a number of counter-arguments. First, it contended that 18 U.S.C. § 3621(b) provides the BOP with the discretion to consider the enumerated factors, but not the duty to do so. Second, it claimed that it did consider the enumerated factors in making the decision to categorically exclude from CCC placement those inmates not within the last ten percent of their sentences. Third, it asserted that it will consider the enumerated factors on an individualized basis when making placement decisions for inmates who are in the last ten percent of their sentences. These arguments were all rejected by *Woodall, Fults, and Levine* for reasons discussed at length in those opinions: Levine provides a scholarly, authoritative and recent exposition of the BOP 2005 rules. Those reasons are summarized below.

The BOP's first argument hinges on the use of the word "may," rather than "shall," at the beginning of § 3621(b). The *Woodall* and *Fults* courts agreed that the term "may" describes the BOP's discretionary ability to place an inmate in any penal facility that meets the appropriate standards. The term does not modify the BOP's duty to consider the five enumerated factors when making placement decisions. The word immediately preceding the factors is "considering." This implies that the BOP must consider all of the factors that follow. This implication is bolstered by the statute's legislative history as discussed in *Woodall*. 432 F.3d at 245-46. Nothing in § 3621(b) suggests that consideration of the factors is optional.

Both *Woodall* and *Fults* agreed that the BOP's contention that it considered all of the factors in making its categorical exercise of discretion is without merit. Three of the five factors relate to an inmate's individual circumstances. Accordingly, it would not have been possible for the BOP to consider all of the factors when it promulgated the regulations. It is impossible for the BOP to consider all five factors on a categorical basis. As such, the BOP's regulation

necessarily conflicts with § 3621(b) by excluding an entire class of inmates--those not serving the final ten percent of their sentences-from the opportunity to be transferred to a CCC. Although the BOP has labeled the February 2005 regulation a 'categorical exercise of discretion' it did not exercise its discretion at all. The BOP's regulation removed the opportunity for the BOP to exercise discretion for any and all inmates not serving the last ten percent of their sentences. Section 3621(b) requires that discretion be exercised on an individual basis. Thus, the BOP's regulation conflicts with § 3621(b) and is invalid.

### 5. Recent Circuit Court Rulings Have Resulted In Inconsistent Treatment Of Designation Procedures By The BOP

The very recent rulings of the Courts of Appeal in the Second, Third, and Eighth Circuits have quickly invalidated the February 2005 BOP policy and regulations in *Woodall* and *Fults,* and *Levine v. Apker,* 2d Cir. Docket No. 05-2590, decided July 10, 2006. As a result of these rulings of the Second, Third and Eighth Circuit Courts of Appeals, the BOP policy has abandoned its illegal policy in the ten states encompassed by those Third and Eighth Circuits. See Community Update, Notes to BOP's Local Partners, May 2006, A word from the Administrator No.48. (Exhibit 1). Such abandonment of its invalid policy undoubtedly will commence in the Second Circuit after the declaration of the BOP policy as invalid.

### 6. Numerous Additional Judicial Rulings Support Abandonment Of The BOP Designation Policy In The Second, Third, Sixth, Eight, Ninth, Tenth And Eleventh Circuits

Following the *Woodall* decision in late 2005, numerous Districts Courts in the Third Circuit have consistently found the BOP policy invalid. *Kogan v. Lindsay,* ___ F.Supp.2d ___, 2006 WL 1548855 (M.D. Pa. 2006); *Baker v. United States,* ___ F.Supp.2d ___ , 2006 WL 1520687 (W.D. Pa. 2006); *Caldwell v. Miner,* 2006 WL 891754 (D.N.J. 2006) (following *Woodall* analysis with regard to a different BOP policy); *Krigsman v. Fed. Bureau of Prisons,*

___ F.Supp.2d ___, 2006 WL 755983 (D.N.J. 2006); *Leaks v. Fed. Bureau of Prisons*, 2006 WL

477001 (D.N.J. 2006), *Harris v. Fed. Bureau of Prisons*, 2006 WL 383546 (D.N.J. 2006);

*Strothers v. Fed. Bureau of Prisons*, 2006 WL 305312 (D.N.J. 2006); *Allen v. Fed. Bureau of*

*Prisons,* ___ F.Supp.2d ___, 2006 WL 20527 (D.N.J. 2006), *Mucha v. Miner,* ___ F.Supp.2d ___

2005 WL 3542473 (D.N.J. 2005); *Hernandez v. Fed. Bureau of Prisons*, ___ F.Supp.2d ___,

2005 WL 3527252 (D.N.J. 2005).

After the *Fults* decision in April 2006, an overwhelming number of Districts Courts in

the Eight Circuit have similarly found the BOP policy invalid. *Beeks v. Caraway*, ___ F.Supp.2d

___, 2006 WL 1716155 (D. Minn. 2006); *Fisher v. Morrison*, ___ F.Supp2d ___ 2006 WL

1716135 (D. Minn. 2006), *Selenica v. Morrison*, ___ F.Supp.2d ___ 2006 WL 1714902 (D.

Minn. 2006); *Williams v. Morrison*, ___ F.Supp.2d ___, 2006 WL 1116630 (D. Minn. 2006);

*Lasco v. Morrison*, ___ F.Supp.2d ___, 2006 WL 1662996 (D. Minn. 2006); *Brigman v.*

*Morrison*, ___ F.Supp.2d ___, 2006 WL 1662922 (D. Minn. 2006), *Carney v. Morrison*, ___

F.Supp.2d ___, 2006 WL 1662910 (D. Minn. 2006); *Durst v. Morrison*, ___ F.Supp.2d ___,

2006 WL 1428261 (D. Minn. 2006); *Mills v. Sanders*, ___ F.Supp.2d ___, 2006 WL 1408337

(E.D. Ark. 2006), *Kelly v. Sanders*, ___ F.Supp.2d ___ 2006 WL 1408334 (E.D. Ark. 2006);

*Goebel v. Morrison*, ___ F.Supp.2d ___, 2006 WL 1314322 (D. Minn. 2006), *White v. Morrison*,

___ F.Supp.2d ___ 2006 WL 1195912 (D. Minn. 2006); *Brasza v. Walton*, ___ F.Supp.2d ___,

2006 WL 1174152 (D. Minn. 2006); *Kiroff v. Morrison*, ___ F.Supp.2d ___, 2006 WL 1050537

(D. Minn. 2006); *Donets v. Walton*, ___ F.Supp.2d ___ 2006 WL 980818 (D. Minn. 2006).

A larger number of District Courts outside the Third and Eighth Circuits have followed

*Fults* and *Woodall* in holding the BOP regulations invalid. Most of the District Courts in the

Second Circuit have declared the regulations invalid. See *Yin Mei Ku v. Willingham*, ___

18

F.Supp.2d ___, 2006 WL 1359050 (D. Conn. 2006); *Martin v. Willingham*, ___ F. Supp. 2d ___,

2006 WL 1236724 (D. Conn. 2006); *Evans v. Willingham*, 413 F. Supp. 2d 155 (D. Conn. 2006);

*Baker v. Willingham*, ___ F.Supp.2d ___, 2005 WL 2276040 (D. Conn. 2005); *Pimentel v.*

*Gonzalez*, 367 F.Supp.2d 365 (E.D.N.Y.2005); *Lesnick v. Menifee*, ___ F.Supp.2d ___, 2005 WL

2542908 (S.D.N.Y. 2005); *Drew v. Menifee*, 2005 WL 525449 (S.D.N.Y. 2005); *Wiesel v.*

*Menifee*, 2005 WL 1036297 (S.D.N.Y. 2005); The Court of Appeals for the Second Circuit has

clarified the matter by declaring the BOP policy and regulations invalid by its well-reasoned and

authoritative decision in Levine v. Apker, Docket No. 05-2590, decided July 10, 2006.

      District Courts in the First, Ninth and Eleventh Circuits have also invalidated the 2005

BOP policy. See *McDonald v. Sawyer*, 2003 WL 24046340 (N.D.Ga. 2003); *Wiederhorn v.*

*Gonzales*, ___ F.Supp.2d ___, 2005 WL 1113833 (D.Or. 2005); *United States v. Paige*, 369

F.Supp.2d 1257 (D.Mont.2005); *Cook v. Gonzales*, 2005 WL 773956 (D.Or. 2005); *Horn v.*

*Ellis*, 2006 WL 1071959 (E.D. Cal. 2006); and Putnam v. Winn, CA No 06-40068, DC Mass.,

2006 U.S. Dist. LEXIS 46123, decided July 7, 2006.[2]

## 7.    **Plaintiff Was Denied Equal Protection Of Law.**

      The Supreme Court's equal protection jurisprudence is well-established: unequal

treatment of similarly situated individuals, in the absence of a suspect classification, cannot stand

unless the Government establishes that such treatment is rationally related to a legitimate

Governmental interest. City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 440 (1985)

(striking down unequal treatment of mentally retarded individuals under rational basis standard).

In the context of equal protection challenges by prisoners, the Eleventh Circuit has held, "[I]f

distinctions between similarly situated individuals are to withstand an equal protection analysis,

such distinctions must be reasonable, not arbitrary and must rest on grounds having a fair and

---

[2] The Order requested in this action is taken directly from the Order issued in Putnam.

substantial relation to the object of the legislation." HendKing v. Smith, 781 F.2d 850 (11th Cir.

1986) citing Zieglar v. Jackson, 638 F.2d 776, 779 (5th Cir. Unit B 1981). Dissimilar treatment

must bear a rational relationship to a legitimate penal interest. See Williams v. Lane, 851 F.2d

867, 881 (7th Cir. 1988)(holding that inmates' equal protection rights were violated when

programs and living conditions for protective custody inmates were unequal in comparison with

general population and not justified by security concerns), citing Hudson v. Palmer, 468 U.S.

517, 522-23 (1984).

    While the Government may permissibly treat some groups differently, it "may not rely on

a classification whose relationship to an asserted goal is so attenuated as to render the distinction

arbitrary or irrational." City of Cleburne, 473 U.S. at 446. Moreover, "where the [defendant's]

interest is substantial and the government's interest in putting forth the policy in question is

unquantifiable or de minimus, such a policy cannot withstand even rational basis review."

Dillingham v. INS, 267 F.3d 996, 1009 (9th Cir. 2001)(invalidating INS decision not to recognize

foreign expungements for drug offenses on equal protection grounds under rational basis

standard), citing Stanley v. Illinois, 405 U.S. 645, 656 (1972).

    Applying these well-established constitutional principles to this case reveals that the

BOP's new policy violates the Equal Protection Clause. The BOP's conduct with respect to the

incarceration and release of inmates is governed generally by 18 U.S.C. §3621 and §4046 and

CCC placement under §3624. Section 3621 (e) provides for drug program within the BOP

designed to assist inmates in becoming rehabilitated. That program, commonly referred to as the

RDAP,[3] is addressed in a BOP Program Statement 5330.10, which states in pertinent part:

---

[3] The Shock Incarceration Program under 18 U.S.C. §4046, is similar to the RDAP and is also governed by 18
U.S.C. § 3624(c). The new BOP policy seeks to carve out, again without basis in law, the Shock Program attendees
from the restrictions in halfway house placement recently "found" in §3624(c) to be applicable to non-drug inmates.

Community transitional drug treatment services (CCC) are a critical component of
the transitional drug abuse program. Accordingly, the Warden is strongly
encouraged to approve inmates who successfully complete a residential drug
treatment program for the maximum period of CCC placement.

This Program Statement was developed under the Administrative Procedures Act and is

highly regarded. Section 3621 (e) was further explicated at 28 CFR § 550.50-550.58. At §

550.57 the policy is stated as:

a) An inmate may receive incentives for his involvement in the residential program. These
incentives may include, but are not limited to, the following . . .
2) Consideration for the maximum period of time (currently 180 days) in a Community
Corrections placement [a halfway house] provided the inmate is otherwise eligible for
this designation [emphasis supplied].

If § 3624(c), the statute solely relied on in the OLC memo and the concomitant BOP

rules, 28 CFR §§ 570.20 and 570.21, restricting the halfway house rights of plaintiff and others,

bars transfer or designation to a halfway house prior to 10% of the end of an inmate's term, then

it should also bar the transfer of RDAP and Shock Program inmates since there is no exception

for them in the language of §3624(c).   It is clear that the language "otherwise eligible for this

designation [halfway house]" should apply equally to RDAP, denying them halfway house

designation in excess of ten percent of their terms.  The new rule taking halfway house treatment

from plaintiff excepts RDAP and Shock Program participants from its application.  Therefore, it

is irrefutable that plaintiff has been denied equal protection of law through the implementation of

the change in BOP policy.

There can be no claim that the new rule is rationally related to a legitimate government

purpose.  The government purpose in administering the prison system is to ensure consistent

administration and to protect society by confining offenders in the controlled environments of

prisons and community-based facilities that are safe, humane, cost-efficient, and appropriately

secure, and that provide work and other self-improvement opportunities to assist offenders in

21

becoming law-abiding citizens. There is no legitimate government purpose in not affording this treatment to plaintiff and others similarly situated, while extending it to drug program participants. The new BOP rule, by restricting halfway house treatment to plaintiff and others of his category, will hinder reintegration of prisoners into society, curtail drug program treatment, greatly increase overcrowding of prisons and enormously increase the cost of operating the Bureau of Prisons. The new rule is directly in conflict with these governmental purposes so its discrimination against plaintiff cannot be justified.

### III.   ATTORNEYS FEES

Plaintiff seeks reimbursement for his attorney's fees and expenses under the Equal Access to Justice Act, 28 U.S.C. 2412. That Act allows a prevailing party to recover reasonable attorney's fees and costs if the government's position was not "substantially justified," unless "special circumstances make an award unjust." 28 U.S.C. Section(s) 2412(d)(1)(A) (1994); Pierce v. Underwood, 487 U.S. 552, 556 (1988).

In this matter, the government has lost nearly all cases directly on point with plaintiff's seeking relief from the BOP's improvident and wrongheaded view of the law and its intransigent behavior in implementing it. The government has not acknowledged the wisdom of Judge Fitzpatrick's view that the government would actually be benefited by the issuance of injunctive relief against the 2002 BOP policy and its successors, 28 CFR §§ 570.20 and 520.21, and it has disregarded subsequent cases such as Fults Woodall and Levine. The government has no basis to continue to resist this case and others like it. Because it is hard to imagine a case in which the government's position is less "substantially justified" or the award of attorney's fees is more appropriate and in furtherance of the public good than plaintiff's case here, we request that

plaintiff be reimbursed the fees expended in litigating a matter that should have been resolved after the first few cases on this issue the government lost.

## CONCLUSION

WHEREFORE, for the foregoing reasons and others that may be developed in a hearing on this motion, plaintiff respectfully requests that this Court enter an order preliminarily and permanently enjoining defendants from denying plaintiff's placement in a halfway house as strongly recommended by the sentencing judge.

Respectfully submitted,

Brian W. Shaughnessy, DCN 89946
913 M Street, NW
Suite 101
Washington, DC  20001
(202) 842-1700

Attorney for the Plaintiff
Mark D. Jasperson

23

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**MARK D. JASPERSON**
**9824 Bay Island Drive**
**Tampa, FL  33615**

      **Plaintiff,**

        **v.**

**FEDERAL BUREAU OF PRISONS,**
**320 First Street, N.W.,**
**Washington D.C.  20534,**

      **and**

**HARLEY G. LAPPIN,**
**Director, Federal Bureau of Prisons,**
**320 First Street, N.W.,**
**Washington D.C.  20534,**
**sued in his official capacity,**

      **Defendants.**

**Case No. _____**

### TEMPORARY RESTRAINING ORDER

Upon consideration of plaintiff Mark D. Jasperson's Motion for a Temporary Restraining Order, any response thereto and the entire record herein, and the Court having found that:

1.    Plaintiff will suffer irreparable harm and loss if defendant is not required to reconsider plaintiff's designation to a halfway house pursuant to the standards of the Bureau of Prisons employed prior to December 2002 without consideration of without consideration of 28 CFR §§ 520.20 and 520.21;

2.    Plaintiff has no adequate remedy at law;

3.    Greater injury will be inflicted upon plaintiff by the denial of temporary injunctive relief than would be inflicted upon defendant by the granting of such relief; and,

4.    The public interest favors the issuance of this order; it is this _____ day of _____, 2006,

**ORDERED** that defendant is temporarily restrained and enjoined, directly or indirectly, and whether alone or in concert with others, including any officer, agent, representative and/or employee of defendant until further Order of this Court from designating plaintiff to a prison facility. It is further

**ORDERED** that within ten calendar days of this Order, Defendant is Ordered to reconsider plaintiff's CCC placement in good faith in accordance with the standards employed by the Bureau of Prisons prior to December 2002 and without consideration of 28 CFR § 520.20 and 520.21, and that within ten calendar days of this Order or before plaintiff is required to report to the Bureau of Prisons, whichever is earlier, an affidavit be filed with this Court demonstrating compliance; and it is further

**ORDERED** that defendant be and he hereby is enjoined from requiring plaintiff to surrender to a BOP facility until plaintiff's request for a preliminary injunction shall be determined;

**ORDERED** that no bond shall be required of plaintiff; and it is further

**ORDERED** that a hearing on plaintiff's motion for a preliminary injunction shall be held on the _____ day of _____, 2006; and it is further

2

ORDERED that this Order shall remain in force and effect until such time as this

Court specifically orders otherwise.

 

 

                                                ————————————————

                                                  DISTRICT JUDGE

Copies to:

Brian W. Shaughnessy
SHAUGHNESSY, VOLZER & GAGNER, P.C.
913 M Street, N.W.
Suite 101
Washington, D.C. 20001

U.S. Attorney for the District of Columbia
U.S. Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20001