**United States Marshals Service**
*Middle District of Florida*

---

*Thomas D. Hurlburt Jr.*
*U.S. MARSHAL*

*United States Courthouse - 4th Floor*
*801 North Florida Avenue*
*Tampa, Florida 33602-4519*

June 8, 2006

## DESIGNATION

Mr. Mark D. Jasperson
9824 Bay Isle Drive
Tampa, FL 33615

Re: VOLUNTARY SURRENDER

Dear Mr. Jasperson,

Pursuant to the sentence you received in federal court in the Middle District of Florida, you are hereby directed to report to the following institution on July 7, 2006, before 12:00 noon to begin service of your federal sentence:

USP Atlanta
Satellite Camp
601 McDonough Blvd SE
Atlanta, GA 30315
(404)635-5100

If you have any further questions, you should contact the institution directly at the telephone number listed above.

Respectfully,

Thomas D. Hurlburt Jr.
United States Marshal

C. Horton
Criminal Clerk

cc: Pretrial Services
    AUSA
    Probation





**U.S. Department of Justice**

United States Marshals Service
*Middle District of Florida*

*Thomas D. Hurlburt Jr.*
*U.S. MARSHAL*

*United States Courthouse - 4ᵗʰ Fl.*
*801 North Florida Avenue*
*Tampa, Florida 33602-4519*

August 11, 2006

# DESIGNATION

Mr. Mark D. Jasperson
9824 Bay Isle Drive
Tampa, FL 33615

Re: AMENDED VOLUNTARY SURRENDER DATE

Dear Mr. Jasperson,

Pursuant to the sentence you received in federal court in the Middle District of Florida, you are hereby directed to report to the following institution on August 31, 2006, before 12:00 noon to begin service of your federal sentence:

> USP Atlanta
> Satellite Camp
> 601 McDonough Blvd SE
> Atlanta, GA 30315
> (404)635-5100

If you have any further questions, you should contact the institution directly at the telephone number listed above.

Respectfully,

Thomas D. Hurlburt Jr.
United States Marshal

C Horton
Criminal Program Specialist

cc: Pretrial Services
     AUSA
     Probation

Case 1:06-cv-01488-HHK    Document 2-3    Filed 08/23/2006    Page 3 of 20
Case 8:06-cv-01197-RAL-TBM    Document 1    Filed 06/28/2006    Page 4 of 7
Case 8:04-cr-00285-RAL-MAP    Document 130    Filed 05/05/2006    Page 1 of 3

### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

Case No.:  8:04-cr-285-T-26MAP          Date:          5/5/06

U.S.A. vs.    Mark D. Jasperson

Honorable   RICHARD A. LAZZARA         Interpreter:
Court                                  Courtroom
Reporter:   Claudia Spangler-Fry       Deputy:    Rita J. Cole
Attorney(s) for Government:            Attorney(s) for Defendant:

  Robert Mosakowski                       D. Frank Winkles

Time:    9:16 - 9:35 = .19

### CRIMINAL MINUTES - SENTENCING REFORM ACT SENTENCING

__X__  Plea agreement is ratified & accepted.  __X__  Defendant sworn.  P.O.  Terry Heath

__X__  Defendant is adjudged guilty on count Two of the Indictment

__X__  Count(s) 1 & 3 of the original indictment are dismissed upon motion by the government.

__X__  Imprisonment:   4 Months

__X__  The Court **strongly recommends** confinement: at a local Community Sanctions Center
       so the defendant can continue to operate his business.
       ( )    Defendant to reside at a Community Sanctions Center.
       ( )    Defendant to participate in and receive drug and alcohol treatment & rehabilitation
              while incarcerated.
       ( )    Defendant participate in the 500 Hour Intensive Drug Program.

__X__  Supervised Release:   3 Years.  At the end of 2 successful years of supervised release.

       the Court will consider early termination.

_____  Probation:

__X__  Fine:   $5,000.00    (X)  Yes  to be paid by Monday, May 8, 2006.

_____  Restitution:_____    See Criminal Monetary Penalties - Page 5 of
                                       Judgment for details.
__X__  Special Assessment: $ 100.00    As to Count Two of the Indictment

**EXHIBIT**

1

Case 1:06-cv-01488-HHK    Document 2-3    Filed 08/23/2006    Page 4 of 20
Case 8:06-cv-01197-RAL-TBM    Document 1    Filed 06/28/2006    Page 5 of 7
Case 8:04-cr-00285-RAL-MAP    Document 130    Filed 05/05/2006    Page 2 of 3
Page Two

Sentencing Minutes
Case No:  8:04-cr-285-T-26MAP        Style:  USA v. Mark D. Jasperson

X         Special Conditions of () Probation  (X)  Supervised Release are:

(X) The defendant shall participate in the Home Detention Program for a period of  4 Months , During this time defendant will remain at defendant's place of residence except for employment and other activities approved in advance by defendant's Probation Officer. Defendant will be subject to the standard conditions of Home Detention adopted for use in the Middle District of Florida, which may include the requirement to wear an electronic monitoring device and to follow electronic monitoring procedures specified by the P.O.

(X) The mandatory drug testing provisions of the Violent Crime Control Act are waived. However, The Court authorizes random drug testing not to exceed 104 tests per year.

(X ) The defendant shall cooperate with the Internal Revenue Service regarding all outstanding taxes, interest, and penalties relating to the offense of conviction.

(X) Having been convicted of a qualifying felony, the defendant shall cooperate in the collection of DNA.

(X) The defendant shall provide the Probation Officer access to any requested financial information.

Case 1:06-cv-01488-HHK    Document 2-3    Filed 08/23/2006    Page 5 of 20
Case 8:06-cv-01197-RAL-TBM    Document 1    Filed 06/28/2006    Page 6 of 7
Case 8:04-cr-00285-RAL-MAP    Document 130    Filed 05/05/2006    Page 3 of 3

Sentencing Minutes                                                    Page Three

Case No:  8:04-cr-285-T-26MAP        Style:  USA v. Mark D. Jasperson

_____   Defendant is remanded to custody of U.S. Marshal.

__X__   Defendant to surrender to (X) designated institution as notified by U.S. Marshal

        ( ) at _____ ( ) on _____ (X) on or after _July 7, 2006_

__X__   Defendant advised of right to appeal and to counsel on appeal.

__X__   Notice concerning Special Assessment/Fine/Restitution Payments furnished to counsel for Defendant.

_____   Government's Motion for Downward Departure is  GRANTED / DENIED by the Court. The Court departs downward _____ levels.

_____   Defendant's Motion for Downward Departure is GRANTED / DENIED.  Court departs downward _____ levels.

_____   Oral Motion to Continue Sentencing by the Government / Defendant is orally  GRANTED/DENIED  by the Court.

_____   Motion (Dkt.  ) to Continue Sentencing by the Government/Defendant is GRANTED/DENIED by the Court. Order to follow.

        Sentencing reset for: _____

OTHER: _____

_____

_____


### GUIDELINE RANGE DETERMINED BY THE COURT AT SENTENCING

Total Offense Level: _____11_____

Criminal History Category: _____I_____

Imprisonment Range: ___8___ to ___14___ months

Supervised Release Range: ___2___ to ___3___ years

Fine Range: $ __2,000.00__ to $ __20,000.00__

Restitution: $ ___N/A___ Special Assessment: $ __100.00__

May 3, 2006

Mr. Terry Heath,
United States Probation Officer
United States Probation Office
501 E. Polk Street, Suite 900
Tampa, FL 33602

        Re:     Mark Jasperson Sentencing
                U.S.A. v. Mark D. Jasperson, et al., Case No.: 8:04-CR-285-T-26MAP

Dear Mr. Heath:

     This is a very unusual tax case. As you know from the Presentence Investigation, Mr. Jasperson was attempting to resolve his civil tax liabilities before there was any criminal investigation. Before he had any notice of the criminal investigation, he had overpaid on his tax liability. In fact, his brother had won the lottery and had offered to pay his tax liabilities, but his civil tax counsel had advised that in his opinion the tax liability was overstated. The matter did not get resolved for all the reasons previously stated, which were not attributable to Mr. Jasperson.

     At this point, it appears that under the plea agreement and the calculation of the tax loss, Mr. Jasperson would be sentenced under the guidelines to a ten month split sentence if the Court accepts the terms agreed to by the parties in the plea agreement. We have further requested the Court, under the guidelines, for a two level downward departure for the reasons previously stated which would require Mr. Jasperson to serve a sentence under terms of probation. Any sentence of incarceration imposed will greatly affect hundreds of employees and their families. It is my own opinion, having been involved in this matter for many years now, that the company will not survive if Mr. Jasperson is incarcerated in anything other than a halfway house located in Tampa. Further, a term of probation, which could be very restrictive, would allow Mr. Jasperson to attend to the daily business activities of the company. There is no one else who can

Ex. 2

Terry Heath, US Probation Office
August 22, 2006
Page 2

run the company. In that regard, I thought I would forward to you what many of his work activities include.

Mr. Jasperson works from 9 AM to 8 PM Monday through Friday. He is responsible for dealing with numerous employees, landlords, vendors, marketing representatives and others on the east coast and on the west coast. The business is 55% on the east coast and 45% on the west coast (California). It is extremely important for him to be able to communicate with the California business contacts. If these hours were required to be shortened, it would be far more important to begin the day later and end it later because of the national nature of the business. I do not know if under a split sentence there is leniency for such a situation.

Mr. Jasperson works half day every Saturday to catch up on business that cannot be accomplished during the week. This is due to the fact that, during the week, he is responding to phone calls and emergencies on an hourly basis while conducting conferences and meetings in between. The Saturday work includes catching up on mail and correspondence, paying bills, conducting research and reviewing leases and documents.

His weekly work includes office duties in the home office. In addition, He is required to attend meetings with employees and vendors from out of town on a regular basis of at least one to three times per week. These meetings are generally held in conference rooms, offices, warehouses, Tampa International Airport or restaurants.

He has attended three critical industry meetings each and every year for the past eight years in out of town locations such as New York, New Jersey, California and Nevada. These meetings require a three night stay and are held every year in January, March and July. Other important industry meetings are called for and sponsored by various movie studios, such as Fox and Warner Brothers, on a sporadic basis once or twice per year.

Approximately once every three months, a critical situation arises in each region that requires him to travel overnight to finalize and approve a new store location or handle an extreme landlord emergency that must be taken care of in person at the location. He uses these emergency trips to review and improve store operations by making necessary and customary visits to each and every store in that region, which requires him to extend the trip from an overnight stay to a three night stay. These three night trips are conducted quarterly for each of the regions surrounding New Jersey, Ohio, Massachusetts and California (a total of four regions encompassing seven states).

Mr. Jasperson has pled guilty in this case. He is extremely remorseful for the harm he has done and wishes to make things right. He did not wish to put the Government, The Court, or his family through the ordeal of a 3 month trial.

Terry Heath, US Probation Office
August 22, 2006
Page 3

He now stands to be sentenced and it will affect many innocent families. A strict probation can be fashioned and comply with sentencing guidelines, whether they be binding or discretionary. I realize Mr. Jasperson has been convicted of a crime upon his plea and his travel and freedom will be restricted but a probationary sentence would allow him, under restrictions, to continue to run the company.

Sincerely yours,
**WINKLES LAW GROUP, P.A.**

D. FRANK WINKLES

DFW/jlg

Mark D. Jasperson
9824 Bay Island Drive
Tampa, Florida 33615

April 10, 2006

D. Frank Winkles, Esq.
707 N. Franklin Street
2nd Floor, Tampa Theatre Building
Tampa, FL 33602

Re: Statement of business affairs

Dear Mr. Winkles:

At your request, I have prepared the following statement regarding my business affairs. The purpose of the statement is to outline my business responsibilities and commitments to our company.

I am the co-founder and CEO of 5215 Development, Inc. and Phoenix Restructuring Group, LLC. 5215 Development, Inc. commenced operations in 1998 in Florida with no employees except my brother, Jay Jasperson, and me. By 1999, we employed 20-25 managers and staff operating several video retail stores. By 2001, Phoenix Restructuring Group, LLC commenced operations as a wholly-owned subsidiary of 5215 Development, Inc. that employs over 300 people in the retail video rental and sale business.

The growth was made possible financially by loans from my brother, Jay Jasperson, and my efforts to establish a positive reputation in the movie industry as an individual who was able to take on the management of failing companies and turn them around. For each newly acquired retail chain of stores, I evaluated and modified the entire business model to focus on responsible management and profitability. I personally replaced and trained management and staff. I renegotiated commitments with all landlords. I established new relationships with suppliers who had been mistreated by previous owners and managers. Most importantly, I have taken a hands-on approach to saving stores wherever possible. I have always placed the interests of the

EX 3

employees first and endeavored to develop the best and the brightest of the existing employee base to save as many jobs as possible.

Through internal growth, in 2001, I negotiated the acquisition of a bankrupt large regional chain of approximately 100 video stores known as West Coast Video and Videosmith. The stores are located in Ohio, Pennsylvania, New Jersey, New York and Massachusetts. The chain was failing and required immediate and close personal management and capital. While only 50 of these stores were salvageable, I saved hundreds of jobs presented by this challenge. I personally interviewed every management employee at the middle, administrative and upper levels. I retained the best members of these groups while laying off the employees who had led to the company's earlier demise.

The bank group that negotiated the sale and the movie studios fully expected me to liquidate the company and fire all of the employees. While this may have been more profitable, I chose to commit myself 24/7 to saving the jobs of the many good and deserving employees who were associated with the company. This decision forced me to ignore any other obligations and put off my marriage and delay having children for several years.

The salvation of this chain was particularly challenging as I was required to evaluate over 100 stores to determine their continued viability, renegotiate leases with over 50 landlords, create new relationships with suppliers, renegotiate pricing and terms, select and re-train key upper and mid-level management, personally develop new pricing and marketing programs, overhaul the management information systems department and systems and develop new strategies to fend off corporate giants, such as Blockbuster and Hollywood Video. This was accomplished with no prior experience in the movie industry which few outsiders believed that it was possible.

In the interim, I continued to search out individual stores and chains for acquisition to continue the positive motion of the company. This has been particularly difficult as the video rental industry operates in a mature and saturated marketplace that faces new challenges constantly. My reputation in the industry for acceptance of difficult projects has been critical to this success.

It is important to more fully understand the complex and difficult environment in which we now operate. One must examine the industry leaders as well as the smaller chains to gain this understanding. Over the past eight years, approximately three-quarters of the independent smaller and regional video chains have closed and exited the marketplace. In addition, four of the top six chains filed for bankruptcy and are no longer in business. The two remaining national chains, Blockbuster and Movie Gallery/Hollywood Video, have seen their stock prices plummet by 90% over the last two years. Both of these companies have been expected to file bankruptcy soon due to their huge long term debt as well as their failure to pay interest payments and supplier debts.

On the other hand, we do have an advantage in that we do not have any long-term debt. Our growth has been funded internally through profits and all taxes have been paid on these profits. However, declining rentals and the loss of VHS revenues lowered store level profits. This has created a significant management challenge. I must personally continue to negotiate with landlords in a constant effort to reduce the footprint of our stores and, thereby, reduce occupancy costs to an acceptable level in order to survive. I must also continue to develop new marketing strategies to remain viable in the marketplace. Finally, I am continuously renegotiating costs and terms with suppliers. I trust my top employees to handle their positions with responsibility and diligence. However, because of my personal business relationships with landlords and industry executives as well as my unique business background, these duties cannot be handled effectively by anyone else in the company. Even a hiatus of my attention of a few months would be virtually impossible to overcome in today's unusually depressed movie rental environment.

In December 2005, through my industry affiliations, I learned of an opportunity to save another chain of stores in distress that were already closed and in bankruptcy. I negotiated the acquisition of Bradley Video, a 10 store chain in northern California. I was able to save 7 of the stores and to save approximately 80 jobs. Movie studio executives supported me in this endeavor because they believed that no one else could make it work. These stores were actually closed for an entire month prior to our acquisition. Again, I was required to personally re-hire,

re-staff and re-train all employees, negotiate with all landlords and suppliers and generally do everything that was required to re-invigorate the chain in a similar fashion to West Coast Video.

I take my job very seriously as over 300 families depend upon me for their livelihood and health care. This is a very serious matter. My brother has supported this endeavor financially due to his faith in me. Furthermore, no investor, bank, landlord, movie studio or supplier has ever lost a single dollar as a result of doing business with me. Conversely, I have prevented losses by all of these categories of creditors and created additional profits and sales for virtually all of them by keeping businesses open and continuing to pay for additional products and services.

In addition, very few, if any, of our movies or products are produced overseas. I am proud to say that our movies and other products are distinctly American-made and create jobs for American movie studio employees at all levels.

Furthermore, in addition to the millions of the income tax dollars that I have paid since 2000, I have paid millions more in sales taxes and millions more in payroll taxes. This would not be possible of the company were to be closed as a result of my inability to operate the business, even for a short time.

In for this business to survive, I must spend full-time continuous efforts steering the direction of the company, searching out and negotiating new opportunities and following up on the small and large details that make this business work.

I meet daily with the Chief Financial Officer to review financial performance and real estate issues, develop monthly budgets and generally steer the financial aspects of the business. The Chief Financial Officer, who is in charge of Management Information Systems, requires my daily input regarding necessary reports for distribution to key employees and the review and refinement of these voluminous reports.

I must conduct daily meetings with the Operations Director of West Coast Video to assure that he is moving in the correct direction and consult with him to make sound

operational decisions affecting hundreds of employees and policies. I must do the same with the less experienced Operations Director of Bradley Video for the California stores and their 80 employees. I conduct regular store visits to stores that are spread over thousands of miles across the country. The Liquidations Director also meets with me daily to consider new leads, evaluate leads for negotiations and consider the viability of stores for long and short term commitments to liquidation stores and to make decisions regarding the elimination of unprofitable ventures.

The Purchasing Manager meets with me daily and requires constant supervision and direction regarding purchase orders for over 50 stores, all of which are approved by me. I also work with him to develop pricing policies and marketing plans. I maintain relationships with the studios and distributors. It is my responsibility to constantly remain in the industry spotlight and to seek out new opportunities for the growth that is necessary for the company to survive.

In addition, I must maintain relationships and constantly re-negotiate with over 50 landlords for rent concessions, new leases and commitments to down-size the footprints of stores that are now too large for current market conditions. Finally, I maintain banking and insurance relations needed to limit costs and provide responsible coverage.

Please understand that this is a brief summary and that I will gladly provide further detail upon request.

Sincerely,


Mark D. Jasperson

Joseph Ciano
7201 Harpers Crossing
Langhorne, PA 19047


April 10, 2006


The Honorable Richard Lazzara
c/o D. Frank Winkles, Esq.
707 N. Franklin Street
2nd Floor, Tampa Theatre Building
Tampa, FL 33602


Re: Reference for Mark Jasperson


Dear Sir:

I am the CFO of Phoenix Restructuring Group, LLC and prior to that I was the Chief Accounting Officer of West Coast Entertainment Corp. I have been involved in the video industry for over 15 years. The video industry is constantly changing and the last two years have been particularly challenging. Many video store chains have not survived. Phoenix Restructuring Group is one of the few chains that have survived and it is directly attributable to Mark Jasperson.

I have known Mark since February 2001 when he took control of the remaining West Coast Video stores and hired the remaining employees of West Coast Entertainment Corp including myself. I have worked on a daily basis with Mark since then. All of the key employees hired by Mark have continued to work with Mark for the last 5 years. I attribute this to Mark leadership skills as CEO. Mark has been and is instrumental in keeping this company running with over 350 employees.

In 2001 it would have been easier and probably more lucrative to liquidate the stores, but Mark made the decision to save hundreds of jobs and build the company with the existing employees. The effort involved in keeping the company together was 24/7.

The company has two divisions. One division is a video rental chain and the other is liquidating other owner's video stores, which are closing. Mark's involvement is critical to both.

Liquidations – The company acquires video stores that are closing. Mark negotiates and completes all acquisitions. Several major acquisitions include approx. 75 West Coast Video stores, 40 Video Update stores and over 50 independent stores. The liquidation

*Ex. 4*

side of the business will come to a standstill if Mark was not directly involved in acquiring new stores. This side of the business is critical to the company as a whole.

Retail Stores – The Company operates 35 video rental stores. These stores have been under extreme pressure to survive during the last year. The major components of running these stores are Operations, Purchasing, Real Estate, Acquisitions, Finance and MIS.

Purchasing – Mark is hands on with our purchasing manager and oversees the weekly purchases. Mark negotiated all of our pricing and terms with our suppliers and is critical in maintaining on -going relationships with them.

Operations – Mark is in daily communication with our Operations Officer and is involved in all decision making regarding daily procedures and policy. Mark creates all advertising and marketing programs that are implemented at the store level. Mark is very involved in re-locating and remodeling our stores. Operations is currently involved in on going projects of reducing our store square footage at most of our locations. Mark is critical to its success.

Real Estate – It is imperative that the company continues to reduce its occupancy costs by negotiating with landlords. Mark has renegotiated approximately one third of our leases over the least six months. His relationship with landlords has led to many opportunities for the company. Continuing this process over the next year is crucial for the survival of the company.

Acquisitions – Recently because of Mark's relationships within the industry Phoenix was able to acquire a 10-store chain in California. It was due to Mark's efforts that we were able to acquire these stores. These stores had been closed for over a month and Mark was able to hire back approx. 80 people and re-open the stores. The integration of these stores over the next six months is critical to the chain success.

I can confirm that Mark is extremely dedicated to the company and it employees. Mark has always conducted business in a fair an equitable manner with other businesses as well as with his employees. Without Mark's direction the continuing viability of the company and its employees is extremely questionable.

Without Mark, the company cannot survive and over 350 families will be severely affected.  If there is any way that Mark can remain present and active in the company, the community will be well-served.

Sincerely,


Joseph Ciano

# Community Update

## *Notes to BOP'S Local Partners*

### May 2006

A word from the Administrator:  No. 48

*********************************************************************
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

### Contractors Meeting

Since the last Update was distributed, we held our annual
contractor's meeting in Washington.  These meetings have helped
us develop new procedures and practices and keeps us moving in a
positive direction.

We believe our recent meeting was extremely productive, there was
a great turnout, and a positive exchange of ideas.  Some issues
and concerns raised by the group we plan to address in the future
are:  alternative pricing schemes for CCC services; providing a
clearer definition of what constitutes management staff and
reevaluating contract staff needs and requirements for smaller
contracts; working to enhance consistency with Bureau staff as it
relates to progressive discipline and conducting monitorings; and
considering conducting contractor meetings on a more frequent
basis.

### CCC Name Change

Since 1989, Bureau of Prisons halfway houses have been called
Community Corrections Centers, recently our Executive Staff
approved changing the name to Residential Reentry Centers (RRCs).
This change provides a clearer description of the services and
programs being offered and differentiates community-based
programs from correctional facilities.

Future solicitations for community-based release transition
services will be identified as RRCs.  The name change will not
effect existing facilities and will occur system-wide through
attrition and contract replacement.  However, we have used the
terms halfway house and CCC synonymously for years and now we can
add RRC.



EXHIBIT

## Upcoming Contractors Conferences

The Western Region will hold their regional contractor's conference in Reno, Nevada, during the week of June 12, 2006. The North Central Region will hold their meeting in Indianapolis, Indiana, during the week of September 18, 2006. I encourage everyone to mark their calendars and attend, if possible. Regional conferences are an excellent opportunity to interact with your peers, exchange ideas, and learn something new.

## Performance based contracts

The first two performance-based contracts have been awarded. One in San Francisco, California, and the other in St. Louis, Missouri. We have opened or will be opening performance-based procurements in Philadelphia, Pennsylvania; Orlando, Florida; San Antonio, Texas; and Atlanta, Georgia. Even if your agency is not pursuing a performance based contract, I think you would benefit from reading the solicitation or the Performance Work Statement. It might give you some insight on where Community Corrections is heading in the future.

## Community Corrections Center Placement decisions in the Third and Eighth Circuits

In the U.S. Court of Appeals for the Third Circuit (Woodall v. Bureau of Prisons) and the Eighth Circuit (Fults v. Sanders), a federal inmate challenged the lawfulness of the Bureau's regulation which limits community corrections center placement to 10 percent of the sentence to be served, not to exceed 6 months.

Both Circuits ruled it inappropriate for the Bureau to categorically limit CCC placements as provided in its federal regulation because it did not allow for full consideration of the factors provided in 18 U.S.C. Section 3621(b). Therefore, inmates in these circuits can once again be directly designated to CCCs and inmates in prisons in these circuit states can be transferred to CCCs in excess of the 10 percent provision.

The Third Circuit includes: Pennsylvania, New Jersey and Delaware. The Eighth Circuit includes: Arkansas, Iowa, Minnesota, Missouri, Nebraska, North and South Dakota.

## FINAL THOUGHT

Over the last couple of years it seems we have become extremely busy, with more responsibilities, fewer staff, and deadlines we seem to have little control over. To get it all done, we often shift our priorities and put off what is less pressing at the

moment. Our primary responsibility is public safety, a goal we
can only achieve through effective offender management. As you
are juggling all your job is requiring of you, remember that the
basics of accountability, integrity and responsibility, provide
the cornerstones for what we do. You cannot juggle them or set
them aside.

Thank you all and I hope you enjoy your summer.


                              Stewart Rowles
                              Administrator
                              Community Corrections and
                              Detention Services Branch
                              Correctional Programs Division

--------------------------------------------------------------
Examples of best practices or your comments and ideas on RRC
utilization, may be mailed to:  Federal Bureau of Prisons,
Community Corrections, 320 First Street, Bldg. 400, NW,
Washington, DC 20534; or e-mail them to bop-ccd/comm corr-
**************************************************************

**THERESA STILLWELL - JASPERSON**
9824 Bay Island Dr.
Tampa, FL 33615
Phone: (813) 891-6306 Fax: (813) 891-6406

April 6, 2006

The Honorable Richard Lazzara
c/o D. Frank Winkles, Esq.
707 N. Franklin Street, 2nd Floor
Tampa Theatre Building
Tampa, FL 33602

**RE:  MARK D. JASPERSON**

To Whom It May Concern:

Mark Jasperson is my husband and has been my best friend for more than 12 years.  We have been blessed with 2 children, Jolina 2 ½ and Nikki who will be 1 on 4-25-06.  On May 7, 2004, during the time our family was under investigation, we lost our only son Cody who died shortly after birth.

The last 4 years have been very difficult for our family.  Mark has remained strong during this time and if not for him I don't think I would be here today.  Mark has always been the backbone of our family.  He has always been a good provider, hard worker, honest, loving, and extremely caring person.  More recently he has proven to be a great hands-on father who works from home so that he can spend more time with his children.  He is very unlike most fathers in that he takes both babies to the zoo, aquarium, and Busch Gardens all by himself.  I can't even take both babies to the grocery store without panicking.  Our daughter Jolina is extremely attached to him and I seriously fear for her health if he were not around.

From the time I met Mark and still true today, he has always worked very hard.  There are no business hours with Mark as he is available day and night for business issues or even a personal issue with an employee.  Mark is truly gifted and he shares his gift by providing jobs for others.

Mark is an extremely vital part of our community.  More than 300 employees depend on supporting their families with the jobs Mark has made available for them.  The chain of video stores Mark saved from liquidation would not exist today if not for him, even the

EX. 6

banks didn't have any hope for saving the stores or the hundreds of jobs. I remember when Mark said he was going to turn the stores around I didn't think he could do it. Not because he didn't have the knowledge to do it, but because there was a long line of people telling us it can't be done. Not only did he save the stores from liquidation, he paid the remaining employees a retention bonus that had been promised to them from the bankrupt company. Mark was under no obligation to pay monies due the employees, but he did it. More than $250,000 in retention bonuses was paid to the employees.

This company cannot exist without Mark. The video industry is once again at a stage where decisions must be made in a real time, day to day basis to keep up with the everyday changes and to keep the company afloat. I believe this company will not survive should Mark not be here. This puts my family in serious jeopardy. I am very worried about the survival of my family without him. With the lack of working capital in the company a day could make the difference in whether our stores open tomorrow or not. I fear that without him the companies remaining assets are in great risk of being lost. We have a great team of employees, but the company is at such a volatile stage that Mark must be involved in order for the company to survive.

It is important to know that Mark is a good and honest person. Mark chose to study law because he believes in our government and in the law. His intentions are only to be a well-balanced productive member of society and anything that may have occurred to the contrary was sincerely unintentional.

Mark has done so many good things in his life for his family and others that I ask you to please take into consideration all of his contributions to our community, the 300+ employees whose families count on their jobs, and the millions of dollars he has paid in taxes.

Sincerely,

Theresa Stillwell-Jasperson